Good morning, my name is John Coltsy with the Office of the State Appellate Defender and I represent the appellant, Mr. Aaron Miller in this case. Thank you sir. Good morning, Your Honors. Dan Pibobarczyk on behalf of the people. My last name is spelled P as in Paul, I-W-O-W-A-R-C as in Charlie, Z as in zebra, Y-K. Mr. P. That works. Very good. Gentlemen, it is normally our habit to allow each of you 15 minutes. Would you care to reserve any time in rebuttal? Yes, Your Honors, I would like to reserve two minutes in rebuttal. Certainly. And of course we'll make allowances for questions that may be asked as well. And with that, you may begin. Yes, Your Honor. May it please the Court. Good morning, Your Honors, Counsel. My name is John Coltsy and I represent the appellant in this matter, Mr. Aaron Miller. Mr. Miller raised two issues on appeal and I'd like to concentrate my argument on the first issue on appeal that Mr. Miller's second stage post-conviction petition established a substantial showing of two interrelated constitutional violations. Here, trial counsel failed to use compelling impeachment evidence obvious from the IPRA investigation material that Officer Figueroa mishandled her service weapon and then used that weapon other than her own to shoot Mr. Miller in this incident. I have a question. How did defense counsel originally obtain the IPRA records? The IPRA investigation, the court was made aware of the IPRA investigation and I believe it might have been through, I'm not confident how counsel became aware, but the court reviewed these documents prior to trial and informed the parties that they were relevant. So the trial judge had access to these records and reviewed them before the trial? The trial judge reviewed the IPRA investigation materials before the trial and stated that the parties could use them. The state used them at trial to impeach one of its own witnesses, the complaining witness, about the events that led to the police arriving to arrest Mr. Miller. And there's evidence in the record that defense counsel used them to refresh recollection, but not as any impeachment evidence in this case. So the court was aware generally of the IPRA investigation. I don't think the court was aware of the allegations and findings that Ms. Figueroa mishandled her service weapon or didn't use her service weapon in this case. Trial counsel never brought that fact out, never filed a motion in limine to bring in that evidence as impeachment evidence. Was that evidence apparent from the documents, the IPRA documents that the judge reviewed? Yes, there were several IPRA documents that made it clear that the gun recovered from the scene that was used by Officer Figueroa was not the gun associated with her serial number. And then there was evidence directly from the police evidence technician or locker custodian that when Ms. Figueroa came to receive her gun, about a week after she initially testified to IPRA about the shooting, that the gun did not match, in custody did not match the serial weapon of her gun, which connects one that she didn't have her gun, and the one that was inventoried in the case was one other than her service weapon. I see. And was she still being investigated pursuant to the, you know, improper use of the weapon during the trial? Yes, that investigation lasted until 2015. It was resolved in 2015. Trial occurred in 2012, and then, or 2013, beginning of 2013, and that investigation continued until 2015. It was resolved through a mediation agreement where Officer Figueroa was ultimately disciplined for the mishandling of her service weapon, but also for a finding that she discharged her service weapon other than her own weapon of her own during a police-involved shooting. So this evidence was available to trial counsel in this case. It was clear from the IPRA investigation materials, and it was compelling for two reasons. The first reason that this evidence was compelling impeachment evidence was that trial counsel could have used this to challenge the basic competency of Officer Figueroa. The fact that she mishandled her service weapon, the fact that she wasn't checking to make sure that the weapon she had when she went into duty was her own service weapon, and that she actually used one other than her authorized police weapon all challenged her ability to perceive basic facts, to have attention to detail. It's a core competency of a police officer. What about the issue that the weapon that she used was basically almost identical to the one that she was supposed to have been authorized to use? There was evidence on the record that these weapons were similar, and I think the key issue here is that her competency as a police officer comes into question when she mishandles and confuses her service weapon with someone else's, regardless if it looks similar. She has a responsibility to maintain control over it, and also before she goes into duty and could have to use it in a shooting, confirm that it's hers. And those specific details and competencies and ability to perceive specific details were relevant to the facts of this case, because she testified to very specific details in a short amount of time in a fast-changing environment where small differences made a difference. And her ability to perceive those small differences made a difference in whether or not she perceived the situations, one, where she needed to discharge her firearm, or whether the facts established that Mr. Miller indeed had a specific intent to kill either Officer Foster, her partner, or herself. The second reason this evidence was compelling in Petunia evidence is that it shows that there was a particularly strong motivation to embellish her testimony at trial where she was already certain, she knew she was likely going to be disciplined for mishandling her service weapon and discharging a weapon that was not her own. So in people view, Olson, this Court established the compelling nature of pending IFRA investigations that involve the same incident and how that can create a strong mode of her bias to testify falsely, so that based on the pending nature and the outcome of the trial can influence those findings. But in this case, Ms. Officer Figueroa had extra incentive because she already knew she was going to be a public discipline. So she's trying to avoid two instances of discipline from this one action, additional discipline from what occurred here. But she's not the only witness to this entire incident. You have other witnesses. So sorry to take her testimony aside. You still have other people saying they heard him say, you know, he wants to, I think his exact words was, I want to kill you both, right? So, and then you had other witnesses observing the speed as well of the vehicle, whether it was 5 or 50 miles an hour or whatever, and he got someone hanging out of a car. You know, a moving vehicle, it doesn't matter how fast it's going, it's still a dangerous situation. Your Honor, you're correct that a moving vehicle with an officer on the side of the car can be a dangerous situation. However, removing officer, if we remove Officer Figueroa's testimony from the evidence at trial, we're left with, you know, the trial court here specifically relied on elements of Officer Figueroa's testimony in finding that Mr. Miller had a specific intent to kill Officer Foster. The trial court cited the speed of the car. Now, we know, as you mentioned, Officer Figueroa was the only person to provide testimony that the speed exceeded anything over 20 miles an hour. Officer Foster testified that the car was in the range of 10 to 20. The independent witnesses who were just, you know, bystanders said the car traveled about 20 miles per hour, and at her investigation, Officer Figueroa said 50 to 60 miles per hour. And this is important because the speed at which a car travels in a short distance through an alley with an officer on the outside is completely relevant to an intent to kill. You know, the fact that the car would get going that fast convinces an intent to kill. That's different than if Mr. Miller simply started the car and started driving at about 15 to 20 miles an hour. Additionally, Officer Figueroa was the only witness here who testified to repeated instances of Mr. Miller accelerating. So Officer Foster didn't testify to any specifics or any nature of the acceleration. She simply testified the car started going and that it hit the wall. But Officer Figueroa at the trial testified after each individual instance of contact, Mr. Miller accelerated into the wall. Then he accelerated after that when it hit the garbage cans. And then he started accelerating towards the telephone pole, which also convinces an intent to injure, because he's repeatedly increasing the speed of the car. And the trial court here connected the speed at which it traveled to acceleration. Trial counsel, you know, tried to characterize Officer Figueroa's testimonies that she was, the car was traveling at 50, 60 miles an hour based on her estimation. And the court said, well, she said she couldn't recall, but at least it establishes that she was accelerating very fast to a high speed. And so that was a specific finding the court made that convinced an intent to kill Officer Foster is that speed and acceleration. And we know that Officer Figueroa's testimony was completely contradicted by all the other witnesses, contradicted in some part by the fact that Officer Foster was able to jump or fall off the car without sustaining serious injuries. That's consistent with the car traveling 15 to 20 miles an hour. And when the court cites these specific things, the trial counsel's ability to put those inconsistencies into context with the impeachment evidence from the IPRA reports about the shooting were critical to this case. The trial court specifically argued, you know, trial counsel was arguing, you know, look, there's inconsistencies in this case over some of the facts Figueroa testified to. And the court said, well, that could make her, their testimony, Officer's testimony more credible, because they're not all testifying to the same story. So what was important here was for trial counsel to contextualize those inconsistencies. And he had ample and compelling evidence to be able to do that with the fact that Officer Figueroa wasn't particularly adept at noticing details. The fact that she was unable to notice details or had issue with that, evinced by her mishandling of her service weapon, shows that she might be more likely to actually have to rely on embellishments at trial to establish her, the reasons why she shot Mr. Miller. If she is able to recall events specifically and well, she doesn't need to rely on embellishments. And the fact that she was facing additional punishment. Is it, is the, there was a lot of impeachment of Officer Figueroa. And can we, can we see that that impeachment resulted in a not guilty on the murder of Officer Figueroa? But didn't really prejudice defendant as to Officer, I'm sorry, Miller? There's Officer Foster, Grace Foster. Foster, yeah. So, I mean, she's hanging on to the car between the wheel and the door. I think the trial court's acquittal on the charges of an intent to kill Officer Figueroa is consistent with the fact that she's inside the vehicle. And so, the fact that she's inside the vehicle changes the nature of the threats. And the court really concentrated on the speed at which the car went. But those, those details were specifically provided by Officer Figueroa. And I think it's important to know. But Novak also fired a weapon because he started backing up the vehicle towards her. So, you know, that's, I think that makes a significant difference there. And she fell off of the vehicle. And then, you know, then he starts backing up and he's coming back towards her. And she fired her weapon as well. Yeah, Officer Foster fired her weapon. She testified she wasn't sure exactly when she fell off the car. Like where the position of the car was and when she fired. So it could have been before the car started backing up or when the car was going forward. She was uncertain on those terms. This came up when trial counsel tried to impeach her testimony over the fact that she would have shot as the car was backing up. He would have, yeah, she would have shot when the car was backing up because there's no damage to the rear of the car. It would seem likely that if he's backing up towards her, that would have occurred based on her positioning. She didn't really know. And so what's important here is at the IPRA, I mean, another consideration is that at the IPRA testimony, Officer Figueroa really testified to her belief that she thought that Mr. Miller had a gun prior to this incident. And that intent to kill was based on her belief that he made these threats and he has a gun in the car and he could shoot. She specifically, after recounting all the evidence of how fast the car was, or how the car was moving, she came back to this point. But at trial, she abandoned that testimony. She didn't testify to any of that. And so now at trial, poised to prove that Mr. Miller has an intent to kill her, she has to highlight the facts that she's a passenger in this car and that he's repeatedly speeding up, that he might drive into a telephone pole that he's accelerating. And you're back to Officer Figueroa now. Yeah, Officer Figueroa. Like, specifically, Officer Figueroa's testimony at trial, that the car was moving fast, that implicated reasons why it could be, there could be an intent to kill Officer Foster. Also established the intent to kill her because she was a passenger in the car. So the faster the car is going, the fact that he's going to, at 50 to 60 miles an hour, potentially crash into something, could harm her. She didn't testify that I believed he had a gun and he would shoot me. She testified that he had a gun and he would shoot me. So there's no evidence that a gun was recovered from Mr. Miller. She has to then switch her testimony to appear more credible before the trial court and highlight and embellish facts about the speed of the car. But given the fact that she was using a weapon that wasn't a gun,   wasn't one that was provided to her by the police department, and an also authorized weapon, she knew that already. She was going to go down. I mean, that in and of itself would have caused her to get a suspension. Yes. Why the necessity to elaborate what was going on at the time of the incident? Because it's a further suspension from the same incident, that she discharged her weapon improperly, or shot Mr., you know, where Mr. Miller didn't have an intent to kill either her or Officer Foster, it would have been much worse for her. It would have been even more significant punishments. And that's why, you know, Wilson has said that pending investigations could present some strong motive and bias to testify falsely. But here she specifically had a stronger one because she already knew she'd be in trouble. So she's trying to avoid, like, compounded discipline here. From the same incident where she, you know, and the investigation into the mishandling and misuse of her gun was dealt with this incident, that she discharged a gun other than hers in this incident. So they're tied directly together. Isn't all this conjunction speculation as to what maybe she was thinking and why she was testifying the way she was? I mean, we don't have anything substantial to point to that fact. We have inferences through the inconsistency. Inconsistency is the risk here, her own testimony. I mean, witnesses rarely come out and say, I'm biased. I don't want to get, you know, I'm going to make things, I'm going to embellish the facts here because I don't want to get in further trouble. At the second stage, we need to make a substantial showing. And so we have a substantial showing here that Officer Figueroa's credibility was certainly pivotal to the court's decision on its specific intent to kill Officer Foster. And that this was strong impeachment evidence, compelling impeachment evidence to generally impeach her ability as an officer, her competency to recall facts and recite facts, but also her strong desire to avoid compounded punishment. And so if this court advances this case to a third stage hearing, then Officer Figueroa can testify regarding whether those biases were present and she could be cross-examined on those biases. But here the court, you know, trial counsel left the court with no way to resolve the inconsistencies other than its own conclusion that they might make the police officer's stories more credible when there was evidence available on the record that put these inconsistencies into a different context. The defense counsel didn't know what the ultimate outcome was going to be, right? And so why stir the pot, right? Because as you mentioned earlier, the investigation is still going on during the trial. And since you don't know exactly what's going to happen here and what her testimony is going to be during that investigation, you know, you're kind of asserting that this person is going to go down, they're going to perjure themselves, and there's just a lot of speculation there. Yeah. I mean, to some extent it wasn't, the findings weren't complete yet, although the facts that, I mean, it was known, the IPRA investigation details established the fact that on the day this incident occurred, she was not carrying her service weapon. And then further, the weapon she used to discharge, you know, that she discharged was not her own. So those facts were established. So while the actual findings of discipline weren't imposed, and the eventual outcome, did trial counsel know that a mediation agreement would be reached and that those would be, no. But he, but Officer Figueroa certainly knew she would be punished for that. There's no, there would be no indication that she wouldn't be, you know. And she believed that she could be, which is the important thing, and that it was likely. And that's the bias and prejudice that Wilson points to and is enhanced by the fact that, you know, it already occurred here. And the fact that she's proved that she's not made, that her competency as an officer isn't acute and that she has these difficulties. So why is the term, my gun, perjury? So in this case, that's the second section of constitutional violation we alleged. Figueroa's statement that she possessed is, and I'll correct myself for the court here, that in the briefs I refer to it as my gun but as my weapon was her reference. And she specifically testified when asked, what did you have on your belt by the state? She testified, my weapon. So this was not an aside. This was not merely an accident to say, this is the gun I happen to possess. It was in response to a specific question. And we know that statement was false. She didn't have her weapon. She had a weapon other than hers. I'm sorry. She listed other things, too. But she presumably had her, I don't recall which other things, but there's no indication that those other things weren't hers that she personally used. Also, she did know at the time that that wasn't her gun because trial occurred more than a year after the IPR investigation into the mishandling of her gun. It happened after she, you know, the latest that she knew that she didn't use the gun that was around in this case was September 30th, 2011. And trial commenced after that. So when she testified, she knew that was false. More importantly, the state knew it was false. The state knew this was false testimony. And when the state knows that there's false testimony, it has a duty to correct. And the state didn't correct it here. So the defense counsel don't, right? Because you said that records were available to all parties. The defense counsel did not object to this statement. But the state is offering the evidence has a duty to make sure that they don't secure a conviction through false testimony. And that, you know, duty applies to false statements that go to only to a witness's credibility, when credibility is at issue in the case. Had the state corrected Officer Figueroa's false statement, it would have said, actually, Officer Figueroa did not have a service weapon on that day. She had one other than hers. It would have, one, again, brought to the forefront that Officer Figueroa wasn't a particularly competent police officer. Her testimony that it was my gun conceals the fact that there was an investigation and that she had some issues with core competencies. But, two, it's an instance the trial counsel could have specifically cited to say, I'm arguing here that there's inconsistencies in the trial testimony, and that's the result of Officer Figueroa embellishing her testimony. And specifically here we have Officer Figueroa with an instance embellishing her testimony, saying something that isn't true, that was involved in the matter of the case, which gun she used to shoot. And she only had one weapon on the day of the incident, right? From the record, it can only be determined that she had one gun. Okay, so if we're speculating, as we are to some of the other testimony of hers, it's a generic phrase, my weapon. I was carrying it. It was my weapon, and I used my weapon that I had in my possession at the time. Certainly it can be construed as a generic phrase outside of the context of the fact that there was an investigation for Officer Figueroa into mishandling her gun. And that was the context here. And it was a specific, if she'd only made glancing references, just referring to her gun, but the state made a point of asking her specifically what she carried on her belt that day, and she said, my weapon. So this wasn't a passing reference. It was specifically asking her the items. And she knew at that time that it wasn't her weapon. And so that's a false statement. And it could have been, any correction could have been used to highlight the issues with her credibility in this case, which counsel specifically, and this shows, you know, counsel's failure to use the evidence into the investigation of the gun shows how this wasn't a reasonable strategic decision to avoid it. Counsel specifically challenged, as Your Honors mentioned, Officer Figueroa's credibility based on those inconsistencies. Would it have made a difference if this was a jury trial? I think the fact, I mean, both the court and jury are required to weigh the credibility of the witnesses. It might have made a difference if this was a jury trial, only because maybe we wouldn't have specific findings of fact as to why intent to kill, you know, specific intent to kill was found. The court specifically told us why it found intent to kill. The only objective factor, let's say, that everyone testified to is that the car drove toward the wall. But the fact that that occurred is that that was an intentional act, is belied by the fact that Officer Foster was hanging onto the steering wheel on the left-hand side, which would pull the car towards the wall. So that's for the trial fact to decide. That's a fact that came out of the trial fact to decide whether or not that that created a situation where that would happen or not. That's just the eye of the beholder. That is true, but the court didn't simply rely on that fact. It relied on the speed and the acceleration. Three repeated statements. Officer Figueroa is the only officer and only person who testified to three statements after each individual kind of occurrence in the case, after each impact, you know, whereas Officer Foster only testified to one, which goes to state of mind and intent and whether it was a true threat. And so all these inconsistencies, you know, trial counsel had the ability to recontextualize them in a way that was specific to the case, that showed Officer Figueroa wasn't the most competent officer, had difficulty recalling facts, but also that she had a very strong incentive in this very case to make sure that there was a guilty finding for an intent to kill. Can I ask you a couple of procedural items? Yes. Your arguments are centered on the attempt murder conviction.  So in essence, are you just seeking a new trial as to that conviction? And if so, is that something that procedurally can be done on a petition for post-conviction? Yeah. And so in terms of what underlying, we're asking this case to be advanced to the third stage evidentiary hearing so that we can, you know, have testimony on this issue. But ultimately, challenging intent to kill implicates only the attempt murder conviction. The fact that Officer, you know, Miller was found guilty of, let's say, aggravated battery of a police officer because he was fighting with them or elbowing them, there was no challenge to those underlying findings. But I think it's possible to challenge separate findings. You know, the inconsistencies in evidence went directly to intent to kill here. And so that's the core issue. So our analysis of prejudice is to focus on that one conviction? Yes, because the analysis of prejudice looks to be whether the outcome of trial could have been different. And the outcome of trial could have been different had trial counsel used this compelling impeachment evidence as to that count. And then my second question is your request for relief, which I believe is an alternative request for relief, that we remand this for a second stage? Yeah, so in the alternative, if this court doesn't find that there's a substantial showing to move this claim or the two claims essentially to a third stage evidentiary, that this case be remanded for new second stage proceedings based on trial counsel's failure to properly frame the legal issue regarding the discovery of the Leeds report. So that only deals with one issue, the second stage remand alternative? So if this court were to remand a second stage, you know, post-conviction counsel, new post-conviction counsel would be appointed and they would review the entire record. Again, it could raise whatever issues they found. They could use consistent issues. You know, but if this court found that there wasn't a substantial showing, it would be limited to that issue. So are you suggesting that MS opens the doors to the other convictions as well? Only to new claims concerning them, not to the claims that this court said, well, there's no substantial showing. So you want us to look at the second stage remand request for relief? Yes, as an alternative. And so at that point, all of the ineffectiveness of counsel claims regarding the failure to impeach Officer Figueroa would already have been resolved and would not be part of that second stage. Yes, that is the nature of the relief request. Thank you. So I have one other question. So according to IDOT records, your client is on probation, right? Correct. Oh, I'm sorry. Yeah. Oh, sorry. Apologize. So why are we here? I mean, the fact that he has a conviction, you know, for his, he can challenge his conviction at any time regarding a constitutional violation.  Right, like he wants to challenge his conviction. Okay. I mean, he feels strongly that what occurred here wasn't proper, you know, both with the actions of Officer Figueroa, but also the court's finding. If your honors have no further questions, I'll reserve my time for rebuttal. Thank you. Thank you.  May it please the Court. Evidence that Officer Figueroa was not using her service weapon would not have changed the outcome of defendant's bench trial. We know this because the judge who decided defendant's bench trial told us so. Judge Flood found defendant guilty, and Judge Flood dismissed defendant's petition at the second stage after reviewing all of his allegations and supporting evidence. Judge Flood explained that none of it would have changed his ruling at defendant's bench trial. Second stage dismissals are reviewed de novo. But one of the facts that this court must consider in its de novo review is that the trial judge in this case stated that the evidence defendant presented would not have changed his ruling on the bench trial. This means all of defendant's claims on appeal must fail because they all rely on the supposed significance of Figueroa not using her service weapon. But their allegation is that trial counsel didn't present certain evidence that may have caused a difference in the original trial, which guides the credibility of Officer Figueroa. Right. Which is why it's incredibly helpful in this case that the trial court who heard the bench trial and found the defendant guilty also heard all that additional evidence at the second stage and stated that it would not have changed his ruling on the bench trial. So we know there's no prejudice here. Defense counsel's brief mentions how prejudice can be shown with something that's less than 50% chance of acquittal. But in this case, Judge Flood's telling us there's a 0% chance of acquittal because he was the one who tried the defendant. He heard the evidence. Now he's looking at the stuff that trial counsel didn't use and saying trial counsel was right. That wouldn't have changed my opinion. It was a reasonable decision to not impeach Officer Figueroa with that stuff, and there was no prejudice because I would have found him guilty even if I had completely ignored Officer Figueroa's testimony. It's also important to keep in mind that the record completely supports Judge Flood on this. Defendant was convicted of six offenses, and the evidence of every single one of those offenses was absolutely overwhelming. He was convicted of home invasion of Adele Melcher, aggravated battery on a lawful restraint of Y.D., aggravated battery of Officer Foster and Officer Figueroa, and attempt to murder of Officer Foster. Now on appeal, defendant is only focusing on one element of one offense, and that's the intent to kill. But even on that one element, there is absolutely overwhelming evidence. Just like Judge Flood said, if you take Figueroa out of this case completely, you still have Officer Foster testify that she heard the defendant state that he was going to kill her and Officer Figueroa. That's a death threat. One death threat is more than enough to establish an intent to kill. I'm sorry to interrupt you, but what about the issue that they're raising that Figueroa said she heard it a number of times, but Foster only heard it once? Well, that makes perfect sense because Figueroa was inside the car with the defendant, and Officer Foster was hanging on the side of the car being smashed into a telephone pole in the side of a building. So naturally, Figueroa is in a better position to hear more of what defendant is saying than Officer Foster. And on that same point, opposing counsel also points out how the civilian witnesses that were in the United Center parking lot and observed this incident didn't hear any of defendant's threats. Well, of course, they were much further away. So proximity absolutely affects how each witness did or did not hear the defendant's death threats. But Judge Flood absolutely accepted the credibility of these officers and the credibility of those death threats, and that was both at the time of the bench trial and also when he reviewed all of the additional evidence at the second stage. I would point out that defense counsel also talks about how only Officer Figueroa mentioned the defendant accelerating after he struck the building with Officer Foster hanging on the side of the car. It doesn't matter that she's the only one who mentioned that he accelerated at that point. Everyone else agrees that the defendant kept driving straight, that he maintained the same speed. His foot was on the gas, maintaining that same speed. That's just as incriminating as accelerating. That also shows an intent to continue this offense, an intent to continue his attempt to kill Officer Foster with his SUV. My understanding is the reason they're raising this is to question her credibility because she's got an investigation hanging over her, and she has to justify why she shot him not once but multiple times. Right, and you would think, based off of what opposing counsel says, you would think that trial counsel didn't argue that, but he did. Trial counsel absolutely argued to the trial court at the bench trial that Officer Figueroa and Officer Foster had a motive to embellish their testimony in order to justify shooting the defendant. That was a key part of trial counsel's trial strategy, a key part of his closing argument. The only thing he didn't do was water down that argument by getting into the nitty-gritty about two Glock 19s, two black Glock 19s that were switched that had different serial numbers. That had absolutely nothing to do with any argument about motive to embellish, because the thing is that whether or not the defendant gets convicted is not going to impact whatsoever whether or not she gets punished for mishandling her service weapon. And the record absolutely proves that because the defendant was convicted of six offenses, and she still got suspended for mishandling her service weapon. It's apples and oranges. The only real meaningful motive argument is the one that's associated with the actual IPRA investigation into shooting the defendant and whether that was justified. And trial counsel absolutely made that argument. So there was trial strategy then? Yeah, it was, because it was an extraneous matter. This whole argument about it going to court competency of Officer Figueroa as an officer is nonsense, because we know from the testimony that her gun was a Glock Model 19 semi-automatic handgun, black in color, and her friend's gun, who she trained with, was the exact same thing. It was another black Model 19 Glock semi-automatic handgun that both chambered in 9mm, and they apparently at some point switched guns, but if you don't check the serial number, they look the same. So yes, that was a mistake. Yes, she got punished for that by her employer, but to suggest that that somehow is this compelling impeachment that would somehow make it less likely that she could testify credibly about somebody trying to kill her partner with an SUV, it's nonsense. And trial counsel recognized that, and he focused on what made sense, which was to do exactly what the trial counsel in Wilson wasn't allowed to do. It's kind of weird that opposing counsel in his brief and also today talks about Wilson, because in Wilson, the defense counsel was not allowed to talk about the existence of an IPRA investigation at all. He wasn't able to make an argument that the officers had a motive to lie to justify the shooting. But in this case, that's exactly what trial counsel did. So really, if you take a look at Wilson, it supports counsel's strategy in this case completely. What about the issue that you knew was false testimony and the state presented it anyway? Yes, so let's be clear here. Figueroa never testified falsely. Her use of the phrase, my weapon, was entirely proper. It only took place twice, once in direct examination, once in cross, and it was both in passing. She didn't specifically talk about my weapon. She was listing all the things that were on her duty belt as part of establishing that she was easily recognizable as an officer, because one of the charges was aggravated battery to a peace officer. So what she had on her service belt was absolutely relevant to whether or not the defendant would know that he was battering a police officer when he was fighting with her. And when she said my weapon, she didn't say my service weapon. And if she had been asked if it was her service weapon, she no doubt would have testified honestly with regard to what had happened. But nobody asked her about that because it wasn't relevant. But the thing is, is that in the English language, possessive pronouns like my do not always refer to ownership. Sometimes they refer to very limited forms of possession. People talk all the time about my library book, my shopping cart, my parking spot. None of those are references to them actually having legal ownership of those objects. What they're referring to is the fact that they happen to currently be in possession of those items. When someone's taking notes and they say, wait a second, my pen ran out of ink, they're not making an assertion about their legal ownership of that pen. They're referring to the pen they're currently using. And that's exactly what Officer Figueroa was doing when she referred to my gun. She was talking about the gun that she was currently using. Now, why did she say my gun instead of the gun that I was currently using? Because that's not natural language. That's not how people speak. And, in fact, the way that she worded it was entirely correct. Was she ever asked on direct or cross if that was her service weapon? No, she was not. And as we talked about in the first issue, it was absolutely an appropriate trial strategy for opposing counsel not to get into that sort of petty impeachment. But if she had been asked about it, she would have answered it honestly. There is absolutely nothing in this record to suggest that she intentionally misled anyone about anything. Can you explain what happened with the Leach report regarding the stolen gun? So I point out that just like Issues 1A and 1B, Issue 2, the proposed Brady claim, absolutely fails because Judge Flood looked at that Leach report and said that it was immaterial because the Officer Figueroa's gun simply was not relevant to her credibility. Keep in mind, the shooting of the defendant was the very end of a long stretch of crimes that the defendant committed. And that trial was about all those crimes, the criminal sexual assault, the home invasion, then the aggravated battery and attempt murder. And then he got shot at the end of it. But the trial wasn't about the shooting. It was about all of the defendant's crimes. And it was a collateral issue. Judge Flood recognized that. And this Leeds printout that was obtained during post-conviction proceedings just wasn't relevant. On that point, I've looked at this Leeds printout. And I think that, number one, it's a confusing document because it lacks context. We don't know who entered it. And we don't know why they entered it. But a confusing document isn't proof of a conspiracy. And that's what they're presenting it for. They're saying that because this Leeds document in July shows a report that the gun that Officer Figueroa used was reported stolen, that somehow that means all of the Chicago Police Department is lying when they say that they didn't find out about the switched guns until September 30th. Was there cross-examination on the IPRA investigation itself? So, on the IPRA investigation itself, it was referred to several times during the bench trial. And I think it's accurate to say that opposing counsel made sure to impeach Officer Figueroa and Officer Foster on several inconsistencies in their testimony by refreshing their recollection with the IPRA report. But as Justice Reyes pointed out earlier, the fact that there was an IPRA report going into all of this stuff was something that the trial court was certainly aware of because it was actually a state subpoena that obtained the IPRA reports that were then presented to the court in camera. And the court reviewed all of those and then tendered them to both parties. So the court was aware of the IPRA investigation into the justification for the shooting, as well as the mishandled service weapon. And also the judge heard some of that information in the actual trial because the IPRA documents were used as a way of introducing some of the contradictory testimony of the two officers. Were there any motions in limine regarding the IPRA documents? No, which is a perfect way of distinguishing Wilson because in Wilson, the defense was not allowed to go into the IPRA documents, was not allowed to elaborate on the idea that the officers had a motive to embellish. But in this case, that was absolutely allowed and it was followed through on. I do want to quickly return to the question of this Leeds document because I think that there's an absolutely reasonable inference to be made that the entire theory of its relevance is not true. Because it all is based off the idea that somebody from the Chicago Police Department reported this gun stolen in July. But I think there's a very reasonable inference that it was actually put into the database by someone at the Illinois State Police Forensic Science Center, otherwise known as ISP's Crime Lab, which completely undermines the CPD conspiracy theory. That inference would be based off of, number one, the fact that this Leeds printout is coming from an ISP database. It is obtained by the defendant by a subpoena to ISP. And if you look at the IPRA logs that the defendant attached to his pro se filings, it shows that there is an ISP Crime Lab report, two ISP Crime Lab reports issued in the case. Under the case number that the Leeds printout refers to. The first of those reports was dated August 29, 2011, which is seven weeks after that Leeds entry was made. You can find that entry in the common law record at page 704. It's log entry 51. And then the second report from ISP's Crime Lab was dated October 17, 2011, which is the exact same date that that Leeds entry was canceled. You can find that in the common law record on page 702, and that's log entry 88. So what appears to have happened in this case, producing that document, that Leeds document, what appears to have happened is that the firearm evidence in this case, as normally happens, all the firearm evidence in this case gets sent to the ISP Crime Lab to be worked up for ballistics testing. The inventory sheet in this case for the gun that Officer Figueroa used had the correct serial number on it, but the wrong registered owner. You can see that in the common law record at 1133. So it's reasonable to infer that when ISP discovered the discrepancy between the gun and the inventory sheet that it came with, they put the gun in this database as part of a standard procedure. So there's nothing in that report that really supports the idea that there was some kind of CBD conspiracy to conceal that Figueroa used the wrong handgun in this case. And keep in mind, at the end of the day with this Leeds entry, Judge Flora looked at it. He asked questions to both sides about this Leeds entry at the second stage hearing, and he found that it would not have changed his ruling. So really that Leeds entry, for several reasons, is just a non-issue. Can I ask you about this alternative request for relief that we would need to look at if we find there is not a substantial showing to go to a third stage hearing on the other issues? Can you talk about that? So I think that it's a little like the request is a little bit puzzling, but I think it's very easy to recognize that there's no basis for either one of the remedies, and the appropriate response here is to affirm the trial court's second stage dismissal of this post-conviction petition. But is there a specific question? Yeah, so whether merits, if we have to, I mean, it's a relief that they're requesting today, or in their appeal. And if I understand correctly, they're asking that it go back, their alternative request is that it go back for additional second stage proceedings with new PC counsel on the theory that his current PC counsel was, it was, gave unreasonable assistance. We're not raising a Brady violation. Right. So what is your argument as to the Brady violation? There absolutely positively was no Brady violation here, because that's all based off of the fact that it's all based off this Leeds entry, which wasn't material. It's a confusing document, but it's the duty of the defendant to provide that context at the second stage. He has to provide supporting documentation, and he hasn't. So he's just tossed this document out there and said, oh, I wasn't given this. I don't know what it is, but I wasn't given it, so that's a Brady violation. That's absolutely ridiculous. And also, the whole idea that he received unreasonable assistance at the second stage is also ridiculous, because the claim that the defendant, the defendant actually made in his pro se petition a general due process claim. So all that PC counsel did was shape that general due process claim, because the defendant's pro se petition was 150 pages long and not an easy read. But in that 150-page document, he absolutely presents a general due process claim, saying that there was a conspiracy by the Chicago Police Department to generate false police reports in order to conceal Officer Figueroa's mistake about the gun, and the prosecution tendered that. So there was no duty for PC counsel to raise a new Brady claim. That's not the responsibility of PC counsel. Reasonable assistance just requires shaping of the actual claims that the defendant wants to raise, and that wasn't a Brady claim. The defendant didn't raise a Brady claim in his pro se petition. All he did was raise a general due process claim. So that's what got shaped. That's what got presented to the court, and it makes absolutely no sense to even contemplate sending this back to essentially add a new claim based off of unreasonable assistance when it's very clear that 651C does not require that. Thank you. If there are no further questions, for the reasons presented in the people's brief, as well as those stated here today, the people ask that this court affirm the second stage dismissal of defendant's post-conviction petition. Thank you. Thank you. Your Honor, just two quick points on rebuttal, specifically regarding the applicability of the decision in Wilson, but also Judge Flood's determination at the second stage that he didn't find any of this evidence significant or material. In the opening briefs and reply briefs, Wilson was cited for the proposition of the strength and compelling nature of this impeachment evidence, which that case recognizes. The reason it was there to not allow the trial counsel to use that as impeachment evidence is because pending infirm investigations are strong evidence, compelling evidence, as the Court described, of bias and motive to testify falsely. Here, when Judge Flood dismissed the petition, he never engaged with any potential, with any of this bias. He never said that, you know, despite the fact that there's a pending infirm investigation, I find that these inconsistencies don't put this in a new light. The trial court simply referred back to its factual findings at trial, and it said that, you know, nothing here would change the credibility determinations of any of the witnesses, but specifically involving Officer Figueroa, who testified to the key evidence that he cited supported a specific intent to kill. So Officer Flood's, you know, wasn't given, no one argued at trial, changed the context at trial about Wilson and about pending infirm investigations. It was merely mentioned. That's why it was incumbent upon trial counsel to specifically say why that was so compelling here and just concentrate that here. And, you know, Judge Flood never engaged with that inquiry, never even considered that potential. But he did have the IMPRA documents, right? He did have the IMPRA documents, so to the extent that he, how in-depth he read these or to what extent he read them is unknown, but he said they were relevant to the case. And they involved both investigation to the shooting, different statements from the witnesses involved in the case, including the complainant about, you know, how the police ended up here. So there's many aspects. I do not believe that Judge Flood was aware that the gun not used here, used here, was not Officer Figueroa's and that, you know, trial counsel's failure to put the context of these inconsistencies in the right manner for the trial court could have had a reasonable probability of changing the outcome at trial. You know, the proper test here at second stage is that this wouldn't have. You know, could it have possibly? And Judge Flood never entertained that possibility of whether or of how it could have. Or, you know, as opposing counsel mentioned, a probability of less than 50%. He never engaged in that calculus. And so for these reasons, we ask you that you send, you know, advance the first two claims to a second stage or third stage proceeding and or alternatively return it to the second stage for the leads investigation. Thank you. Thank you. All right. Gentlemen and ladies, I'd like to thank you for an interesting argument. Thank you all for coming in. And we shall get a written decision to you in a reasonable length of time.